**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

TOMMIE RAY DRUMMOND,    :

      Petitioner,    :

vs.    : CIVIL ACTION NO. 08-0294-CG-C

UNITED STATES OF    : CRIMINAL ACTION NO. 07-0017-CG
AMERICA,

                        :

      Respondent.

## REPORT AND RECOMMENDATION

Petitioner, Tommie Ray Drummond, a federal prison inmate proceeding
*pro se*, has filed a motion to vacate, set aside or correct his sentence pursuant
to 28 U.S.C. § 2255 (Doc. 21; *see also* Doc. 22). This action has been referred
to the undersigned for entry of a report and recommendation pursuant to 28
U.S.C. § 636(b)(1)(B). It is recommended that Drummond's § 2255 motion be
denied.

## FINDINGS OF FACT

1.      On February 5, 2007, the United States filed an Information
against Drummond charging him with two counts of bank fraud in violation
of 18 U.S.C. §§ 1344 and 2. (Doc. 1)

2.     That same date, February 5, 2007, the parties filed a plea agreement with the Court, same being signed by the defendant and his attorney, as well as the attorneys for the United States. (*See* Doc. 2) The plea agreement reads, in relevant part, as follows:

## PLEA AGREEMENT

Defendant **TOMMIE RAY DRUMMOND**, and his counsel, Garve Ivey, Jr., and the United States of America have reached a plea agreement in this case, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the terms and conditions of which are as follows:

## RIGHTS OF DEFENDANT

1.     **TOMMIE RAY DRUMMOND** understands his rights as follows:

  a. To be represented by an attorney;

  b. To plead not guilty;

  c. To have a trial by an impartial jury[,] which must reach a unanimous verdict;

  d. To confront and cross-examine witnesses and to call witnesses and produce other evidence in his defense;

  e. To not be compelled to incriminate himself.

## WAIVER OF RIGHTS AND PLEA OF GUILTY

2.     **TOMMIE RAY DRUMMOND** waives rights b through e, listed above, and pleads guilty to each of Counts 1 through 2 of the Information, each of which charges a violation

2

of 18 U.S.C. §§ 1344 and 2 (bank fraud).

.    .        .

5.     **TOMMIE RAY DRUMMOND** is not under the influence of alcohol, drugs, or narcotics. He has no reason to believe that he is now, or ever has been, insane or of unsound mind and is certain that he is in full possession of his senses and is mentally competent to understand this plea agreement and the guilty plea hearing which will follow.

6.     **TOMMIE RAY DRUMMOND** has had the benefit of legal counsel in negotiating this plea agreement. He has discussed the facts of the case with his attorney, Garve Ivey, Jr., and Garve Ivey, Jr. has explained to **TOMMIE RAY DRUMMOND** the essential legal elements of the criminal charge(s) which has/have been brought against him. Garve Ivey, Jr. has also explained to **TOMMIE RAY DRUMMOND** his understanding of the United States' evidence.

7.     **TOMMIE RAY DRUMMOND** understands that the United States has the burden of proving each of the legal elements of the criminal charge(s) beyond a reasonable doubt. **TOMMIE RAY DRUMMOND** and his counsel have discussed possible defenses to the charge(s). **TOMMIE RAY DRUMMOND** believes that his attorney has represented him faithfully, skillfully, and diligently, and he is completely satisfied with the legal advice of his attorney.

8.     A separate document, entitled Factual Resume, will be submitted to the Court as evidence at the guilty plea hearing. The Factual Resume is incorporated by reference into this Plea Agreement. **TOMMIE RAY DRUMMOND** and the United States agree that the Factual Resume is true and correct.

9.     These pleas of guilty are freely and voluntarily made and is (sic) not the result of force, threats, promises, or representations apart from those set forth in this plea agreement.

3

**There have been no promises from anyone as to the particular sentence that the Court may impose**. **TOMMIE RAY DRUMMOND** avers that he is pleading guilty because he knows that he is guilty and wants the benefits of this plea agreement.

## PENALTY

10.    The maximum penalty the Court could impose as to each count of the Information is:

a.    30 years imprisonment;

b.    A fine not to exceed $1,000,000;

c.    A term of supervised release of 5 years, which would follow any term of imprisonment. If **TOMMIE RAY DRUMMOND** violates the conditions of supervised release, he could be imprisoned for the entire term of supervised release;

d.    A mandatory special assessment of $100.00; and

e.    Such restitution as may be ordered by the Court.

## SENTENCING

11.    **The Court will impose the sentence in this case. The sentence will be calculated pursuant to Title 18 U.S.C. Section 3553(a) and the Sentencing Reform Act of 1984, making the Federal Sentencing Guidelines applicable. TOMMIE RAY DRUMMOND has reviewed the application of the Guidelines with his attorney and understands that no one can predict with certainty what the sentencing range will be in this case until after a pre-sentence investigation has been completed and the Court has ruled on the results of**

that investigation. **TOMMIE RAY DRUMMOND understands that he will not be allowed to withdraw his guilty plea if the applicable Guideline range is higher than expected or if the Court departs from the applicable range.**

12.   **The United States and TOMMIE RAY DRUMMOND agree that any sentence within the applicable Guidelines range as determined by the Court is reasonable pursuant to Title 18, U.S.C. Section 3553(a)**.

13.   The United States may provide all relevant sentencing information to the Probation Office for purposes of the pre-sentence investigation. Relevant sentencing information includes, but is not limited to, all facts and circumstances of this case and information concerning **TOMMIE RAY DRUMMOND's** background.

14.   **TOMMIE RAY DRUMMOND understands that this plea agreement does not create any right to be sentenced within, or below, any particular punishment range and fully understands that determination of the sentencing range or Guideline level, as well as the actual sentence imposed, is solely the province of the Court**.

15.   Both **TOMMIE RAY DRUMMOND** and the United States are free to allocute fully at the time of sentencing.

.    .    .

## RESTITUTION

17.   Pursuant to 18 U.S.C. §§ 3556 and 3663(A), restitution is mandatory. **TOMMIE RAY DRUMMOND** agrees to make full restitution, to the following victims in the amounts listed below before credits:

a.   West Alabama Bank and Trust   $313,230

5

| b. | Merchants and Farmers Bank | $394,100 |
| c. | Sweet Water State Bank | $273,400 |
| d. | First National Bank of Jasper | $268,705 |

18.   **TOMMIE RAY DRUMMOND** understands and agrees that the determination of the actual amount of restitution is solely within the discretion of the Court.

## UNITED STATES' OBLIGATIONS

19.   The United States will not bring any additional charges against **TOMMIE RAY DRUMMOND** related to the facts underlying the Information. This agreement is limited to the United States Attorney's Office for the Southern District of Alabama and does not bind any other federal, state, or local prosecuting authorities.

20.   The United States will recommend to the Court that the counts of the Information be grouped for sentencing; that the sentence for each count be served concurrently; and that **TOMMIE RAY DRUMMOND** be sentenced at the **low end of the sentencing guideline range as determined by the Court**.

## LIMITED WAIVER OF RIGHT TO APPEAL SENTENCE

21.   **TOMMIE RAY DRUMMOND** acknowledges that he is aware that 18 U.S.C. § 3742 affords a defendant the right to appeal the sentence imposed. In exchange for the recommendations made by the United States in this Plea Agreement, **TOMMIE RAY DRUMMOND** knowingly and voluntarily waives the right to appeal any sentence imposed in accordance with the recommendations of the United States contained herein.

22.   With the limited exceptions noted below, **TOMMIE RAY DRUMMOND** also waives his right to

6

challenge any sentence so imposed, or the manner in which it was determined, in any collateral attack, including but not limited to, a motion brought under 28 U.S.C. § 2255.

23.     **TOMMIE RAY DRUMMOND**  reserves the right to contest in an appeal or post-conviction proceeding any of the following:

a.     Any punishment imposed in excess of the statutory maximum;

b.     Any punishment that constitutes an upward departure from the guideline range; or

c.     A claim of ineffective assistance of counsel.

24.     In addition, **TOMMIE RAY DRUMMOND** reserved the right to petition the Court for resentencing pursuant to 18 U.S.C. § 3582 in the event of a future retroactive amendment to the Sentencing Guidelines which would affect the defendant's sentence.

(*Id*. at 1-6 (some emphasis supplied)) Appearing before Drummond's signature line on page 8 of the agreement is this paragraph: "I have consulted with my counsel and fully understand all my rights with respect to the offenses(s) charged in the Information pending against me. **I have read this Plea Agreement and carefully reviewed every part of it with my attorney**. I understand this agreement, and I voluntarily agree to it. I hereby stipulate that

7

the Factual Resume,[1] incorporated herein, is true and accurate in every respect,

---

[1]     The Factual Resume, which Drummond also signed, reads as follows:

The defendant, **TOMMIE RAY DRUMMOND**, admits the allegations of Counts 1 and 2 of the Information.

### ELEMENTS OF THE OFFENSE

Defendant TOMMIE RAY DRUMMOND understands that in order to prove the violations of Title 18, United States Code, Sections 1344 and 2, charged in Counts 1 and 2 of the Information, the United States must prove that:

1.     The Defendant executed a scheme to obtain money, assets and property from a financial institution by means of false and fraudulent pretenses, representations and promises relating to a material fact, as charged;

2.     The Defendant did so willfully with an intent to defraud;

3.     The false and fraudulent pretenses, representations, and promises were material; and

4.     The financial institution was federally insured.

### OFFENSE CONDUCT

Defendant TOMMIE RAY DRUMMOND admits in open court and under oath that the following statement is true and correct and constitutes evidence in this case.

DRUMMOND owned and operated with another an Alabama corporation called Southern Business, Inc. ("SBI").

DRUMMOND[,] through SBI[,] operated a chain of local convenience stores located in west central Alabama and east Mississippi from 1996 to 2003. He operated about eleven stores by late 2002. The stores sold petroleum products under a licensing agreement as well as alcohol, tobacco, and food to the traveling public. DRUMMOND deposited the daily receipts of the stores which consisted mostly of cash, with some lesser amounts of checks and credit card sales into financial institutions.

---

The maximum gross sales for all the stores was about $8 million per year. SBI lost money every year. Its revenue from sales to the public was not enough to cover its expenses such as leasing costs for store buildings; petroleum products and other inventory; and interest on business loans. The initial purchase of the stores and the inventory, equipment and other things needed to operate the stores was financed by loan(s) with West Alabama Bank and Trust and Regions Bank.

SBI had business checking accounts at seven separate financial institutions which were roughly coterminous with the locations of the stores. The insured depository institutions used by SBI included: Trustmark Bank, Meridian, Mississippi; Merchants and Farmers Bank, Eutaw, Alabama; West Alabama Bank and Trust, Reform, Alabama; Sweet Water State Bank, Linden, Alabama; First National Bank of Jasper, Jasper, Alabama; Bank of York, York, Alabama; and Regions Bank, Livingston, Alabama (collectively the "financial institutions"). The financial institutions were all insured by the Federal Deposit Insurance Corporation ("FDIC"). DRUMMOND signed the checks issued by SBI.

DRUMMOND knowingly took advantage of the fact and the trust that a check deposited at a financial institution used by SBI was immediately credited to the SBI account into which it was deposited into regardless of how long it took the institution to collect the check. There was at least a one day, and usually more, of float for cycling checks through the check payment system among and between the financial institutions in Alabama and Mississippi. The immediate provisional credit to the checking account for deposits was known as the uncollected balance.

Because there was insufficient cask flow generated by regular operations of SBI to pay its expenses and business loans, DRUMMOND executed a scheme to defraud the financial institutions used by SBI to obtain funds by artificially inflating the uncollected funds balance. Starting sometime around 1998 and up until February 2003, and to execute the scheme[,] DRUMMOND exchanged an ever increasing number and dollar volume of checks in a coordinated manner among and between SBI checking accounts at the financial institutions to take advantage of the float. By exchanging checks among and between the accounts in a coordinated manner, DRUMMOND was able to artificially increase the amount of uncollected funds in his checking accounts because all the financial institutions gave DRUMMOND immediate credit on his check deposits. Each checking account covered the checks of each other. Only five financial institutions were involved at any one time in the scheme.

Every business day DRUMMOND[,] assisted by others[,] determined the

amount of outstanding, unpaid checks at each of the financial institutions involved in the scheme at the time. DRUMMOND determined the amount of real deposits made from regular business activity from reports submitted by store managers and subtracted that amount from the amount of outstanding checks that had to be covered by the end of the day. DRUMMOND then determined the number and dollar amount of checks drawn on the same accounts he needed to issue to cover the earlier checks written to keep the scheme going plus amounts he took for himself. None of the coordinated exchange of checks among and between the financial institutions was for the purchase of inventory for sale in the stores.

In making these calculations DRUMMOND prepared worksheets on a daily basis. These worksheets contained lists of checks paid, checks outstanding, checks to be written, and related float calculations. The worksheets contained instructions to and from DRUMMOND and others on how to coordinated (sic) the exchange of checks.

In order to avoid attracting attention by the financial institutions, DRUMMOND divided up the amount to be covered and issued multiple checks for the deposits. He issued most checks for less than $10,000 each. In late 2002, about 60 checks were issued and tracked every business day. The checks used were not entered into the accounts of the books and records of SBI. DRUMMOND signed most of the checks. Thousands of checks were issued and deposited at the direction of DRUMMOND. The volume of checking account activity was extremely high and far exceeded actual business activity as shown on SBI tax returns.

DRUMMOND used family members and SBI employees to deposit checks at the financial institutions because the institutions were widely separated. In some cases DRUMMOND issued checks in advance to be held by others until directed by DRUMMOND when to deposit them.

At various times, the Bank of York, Citizens National Bank, Regions Bank and Trustmark Bank, discovered that SBI was drawing on uncollected funds every day without permission. When questioned DRUMMOND falsely represented that the number and amount of the checks written was the method by which SBI maintained its own books and that the activity in the checking accounts had a legitimate business purpose. Those institutions informed DRUMMOND that they would not permit draws on uncollected funds and either closed or restricted the SBI checking accounts to prevent further abuse. After the

accounts were closed DRUMMOND was forced to find other financial institutions which would give immediate credit on uncollected funds to continue. The large dollar amount and number of checks being cycled through the institutions was not a necessary part of SBI's bookkeeping system.

DRUMMOND made withdrawals based on the fraudulently inflated checking account balances by writing checks to third parties who were not part of the scheme and did not write a reimbursement check back. DRUMMOND also took cash out. DRUMMOND used the funds taken in the scheme to defraud for his own use and benefit, and to the loss and detriment of the financial institutions.

DRUMMOND continued the coordinated exchange of checks among and between his checking accounts until February 2003. At that time Farmers and Merchants Bank froze the SBI checking account at that institution because of excessive drawing on uncollected funds. West Alabama Bank and Trust did the same and the cycle of checks was broken. DRUMMOND was unable to continue and could not cover the last unpaid 199 outstanding checks. SBI was forced into bankruptcy and the stores closed.

During the period September 1, 2002, to January 10, 2003, DRUMMOND[,] working with others, deposited approximately $89.7 million in the financial institutions involved during that time, including the Sweet Water State Bank. He was only able to cover approximately $88.5 million of those checks. After the scheme ended four institutions suffered the following approximate losses before offsets:

| | |
|---|---|
| West Alabama Bank and Trust | $692,675 |
| Merchants and Farmers Bank | $589,529 |
| Sweet Water State Bank | $304,507 |
| First National Bank of Jasper | $420,908 |
| Total gross losses | $2,007,619 |

After offsets of collected funds of $758,469, the net loss suffered by the four financial institutions and the net gain to defendant DRUMMOND was approximately $1,249,149.

and that had the matter proceeded to trial, the United States could have proved

the same beyond a reasonable doubt." (*Id*. at 8 (emphasis supplied))

    3.      On March 6, 2007, Drummond entered a counseled guilty plea

to both charges contained in the Information. (Doc. 28, Guilty Plea Transcript)

> THE COURT:     . . . I understand you are pleading
> guilty to counts one and two of the information; is that correct,
> Mr. Drummond?
>
>     THE DEFENDANT:     Yes, ma'am.
>
>     THE COURT:     All right. Would you place the
> defendant under oath?
>
>     THE CLERK:     Yes, ma'am. Mr. Drummond, raise
> your right hand.
>
> (The defendant was sworn)
>
>     THE DEFENDANT:     I do.
>
>     THE COURT:     . . . Do you understand that you're

---

SBI had a checking account at Sweet Water State Bank in Marengo
County, Alabama. DRUMMOND signed and issued checks drawn on the
financial institution. DRUMMOND made deposits at Sweet Water State Bank or
directed SBI employees or family members to make deposits at that financial
institution during the course of the scheme to defraud. For the period September
1, 2002, to January 1, 2003, DRUMMOND deposited and withdrew
approximately $5.5 million to and from the checking account at Sweet Water
State Bank. On January 24, 27, 28 and 29, 2003, approximately 46 checks issued
by SBI were returned unpaid to Sweet Water State Bank.

(Doc. 2, Factual Resume, at 1-7)

now under oath and if you answer any of my questions falsely, those answers may later be used against you in a separate prosecution for perjury or for making a false statement?

THE DEFENDANT:        Yes, ma'am.

THE COURT:        All right. What is your full name?

THE DEFENDANT:        Tommie Ray Drummond.

THE COURT:        And how old are you?

THE DEFENDANT:        I'm 58.

THE COURT:        And how far did you go in school?

THE DEFENDANT:        I have a B.S. degree in business with a year of law school and a year on my master's.

THE COURT:        Have you been treated recently for any mental illness or addiction to narcotic drugs of any kind?

THE DEFENDANT:        No, ma'am.

THE COURT:        Are you currently under the influence of any drug, medication, or alcoholic beverage?

THE DEFENDANT:        No, ma'am.

THE COURT:        Have you received a copy of the information pending against you?

THE DEFENDANT:        Yes, ma'am.

THE COURT:        Have you fully discussed the charges and the case in general with Mr. Ivey?

THE DEFENDANT:        Yes, ma'am.

THE COURT:          Do you understand the charges that are pending against you?

THE DEFENDANT:          Yes, ma'am.

THE COURT:          All right. I understand that you have signed a waiver of indictment. And I have it. I had it somewhere. Mary Ann, I may have left it.

THE CLERK:          Okay.

THE COURT:          But I need to ask you some questions about that. You have a constitutional right to be charged by the indictment of a grand jury, but you can waive that right and consent to being charged by the information of the U.S. Attorney. Instead of an indictment, these felony charges against you have been brought by the U.S. Attorney by way of an information. Unless you waive indictment, you may not be charged with a felony unless a grand jury finds by the return of an indictment that there is probable cause to believe that a crime has been committed and that you committed it.

If you do not waive indictment, the government may present the case to the grand jury and ask it to indict you.

A grand jury is composed of at least 16 and not more than 23 persons, and at least 12 grand jurors must find that there is probable cause to believe that you committed the crime with which you are charged before you may be indicted.

The grand jury might or might not indict you. If you waive indictment by the grand jury, the case will proceed against you on the U.S. Attorney's information just as though you had been indicted.

Have you discussed waiving your right to indictment by the grand jury with your attorney?

14

THE DEFENDANT:        Yes, ma'am.

THE COURT:       Do you understand the right to indictment by a grand jury?

THE DEFENDANT:        Yes, ma'am.

THE COURT:       Have any threats or promises been made to you to induce you to waive indictment in this case?

THE DEFENDANT:        No, ma'am.

THE COURT:       Do you wish to waive your right to indictment by a grand jury?

THE DEFENDANT:        Yes, ma'am.

THE COURT:       And, Mr. Ivey, do you know of any reason why Mr. Drummond should not waive his right to indictment by a grand jury?

MR. IVEY: No, ma'am, I don't.

THE COURT:       I find the waiver is knowingly made and we will proceed.

Are you fully satisfied with the counsel, representation, and advice given to you in this case by Mr. Ivey?

THE DEFENDANT:        Yes, ma'am.

THE COURT:       **All right. Now, I have been provided with a plea agreement and an attached factual resume which appears to have your signature on both of those documents. I want you to take a look and tell me on the record whether that is your plea agreement and factual resume and whether you signed those documents. . . .**

15

THE DEFENDANT:        **(Reading.) Yes, ma'am.**

THE COURT:        **Did you have the opportunity to read and discuss the plea agreement with Mr. Ivey before you signed it?**

THE DEFENDANT:        **Yes, ma'am.**

THE COURT:        **Does the plea agreement have all of the agreements that you have with the United States Government concerning your case written down in the agreement?**

THE DEFENDANT:        **Yes, ma'am.**

THE COURT:        **Do you understand the terms of your plea agreement?**

THE DEFENDANT:        **Yes, ma'am.**

THE COURT:        **Has anyone made any other or different promises or assurances to you of any kind in an effort to induce you to plead guilty in this case?**

THE DEFENDANT:        **No, ma'am.**

THE COURT:        **Do you understand that certain terms of the plea agreement are merely recommendations to the Court and that I can reject those recommendations without permitting you to withdraw your plea of guilty and impose a sentence that is more severe than you might anticipate?**

THE DEFENDANT:        **Yes, ma'am**.

THE COURT:        **Has anyone attempted in any way to force you to plead guilty in this case?**

THE DEFENDANT:          **No, ma'am.**

THE COURT:     **Are you pleading guilty of your own free will because you are guilty?**

THE DEFENDANT:          **Yes, ma'am.**

THE COURT:          Do you understand that the offense to which you're pleading guilty is a felony offense and that if the plea is accepted, you will be adjudged guilty of that offense and that such adjudication may deprive you of valuable civil rights such as the right to vote, the right to hold public office, the right to serve on a jury, and the right to possess any kind of firearm?

THE DEFENDANT:          Yes, ma'am.

THE COURT:          The maximum possible penalty provided by law on each count of the information is up to 30 years imprisonment, a fine not to exceed $1 million, a term of supervised release of five years which would follow any term of imprisonment, and if you violated the conditions of supervised release you could be imprisoned for that entire term as well, a mandatory special assessment of $100, and any restitution that the Court determines is appropriate. Do you understand those possible consequences of your guilty plea?

THE DEFENDANT:          Yes, ma'am.

THE COURT:          **Now, under the Sentencing Reform Act of 1984, the United States Sentencing Commission has issued guidelines for judges to consider in determining the sentence in a criminal case. Have you and Mr. Ivey talked about how the sentencing guidelines might affect your sentence?**

THE DEFENDANT:          **Yes, ma'am.**

17

THE COURT:        **Do you understand that I will not be able to determine the advisory guidelines sentencing range for your case until after a presentence report has been completed and you and the government have had the opportunity to challenge the reported facts and the application of the guidelines recommended by the probation office?**

THE DEFENDANT:        **Yes, ma'am**.

THE COURT:        **And . . . that the sentence imposed may be different from any estimate your attorney or anyone else may have given you?**

THE DEFENDANT:        **Yes, ma'am, I do.**

THE COURT:        **Do you also understand that after your guideline range has been determined, the guidelines themselves further provide for departures either upwards or downwards from that range in certain circumstances?**

THE DEFENDANT:        **Yes, ma'am**.

THE COURT:        And do you understand that although the Court is required to consider the guidelines, they are merely advisory and do not necessarily control the sentence imposed?

THE DEFENDANT:        Yes, ma'am.

THE COURT:        Do you understand that in the federal system parole has been abolished and if you are sentenced to prison you will not be released on parole?

THE DEFENDANT:        Yes, ma'am.

THE COURT:        Do you understand that under some circumstances you or the government may have the right to appeal any sentence that I impose? However, your plea

agreement contains a limited waiver of the right to appeal the sentence itself, and in your case you have reserved the right to appeal only if punishment is imposed in excess of the statutory maximum, if punishment is imposed that constitutes an upward departure from the guideline range, or if you have a claim of ineffective assistance of counsel. Do you understand that you have waived your right to appeal the sentence itself in all but those three circumstances outlined in your plea agreement?

THE DEFENDANT:          Yes, ma'am.

THE COURT:          Do you understand that you have a right to plead not guilty to any offense charged against you and to persist in that plea, and that you would then have the right to a trial by jury, that at that trial you would be presumed innocent and the government would have to prove your guilt beyond a reasonable doubt, you would have the right to the assistance of counsel for your defense, the right to see and hear all of the witnesses and have them cross-examined in your defense, the right on your own part to decline to testify unless you voluntarily elected to do so in your own defense, and the right to the issuance of subpoenas to compel the attendance of witnesses to testify in your defense?

THE DEFENDANT:          Yes, ma'am.

THE COURT:          And do you understand that if you went to trial and decided not to testify or to put on any evidence, those facts could not be used against you?

THE DEFENDANT:          Yes, ma'am.

THE COURT:          Do you further understand that by entering a plea of guilty, if that plea is accepted by the Court, there will be no trial and you will have waived or given up your right to a trial as well as those other rights associated with a trial that I've just described?

19

THE DEFENDANT:        Yes, ma'am.

THE COURT:        All right. Now, you are pleading guilty to violations of Title 18, United States Code, Section 1344, and the aiding and abetting statute, section two. And in order to convict you of that offense, the United States would have to prove that you executed a scheme to obtain money, assets, and property from a financial institution by means of false and fraudulent pretenses, representations, and promises relating to a material fact, as charged, that you did so willfully and with intent to defraud, and that the false and fraudulent pretenses, representations, and promises were material, and that the financial institution was federally insured.

Do you understand what the government would have to prove in order to convict you of those offenses?

THE DEFENDANT:        Yes, ma'am.

THE COURT:        All right. . . . **Now, I asked you earlier if you had signed the plea agreement and factual resume and you said you had, and I want to make sure that you understand that by signing the factual resume you are agreeing that the government could prove the facts set forth in that document in order to support your guilty plea and your conviction. Do you agree to that?**

THE DEFENDANT:        **Yes, ma'am.**

THE COURT:        . . . **I will now ask you how do you plead to the charge[s], guilty or not guilty?**

THE DEFENDANT:        **Guilty.**

THE COURT:        . . . It is the finding of the Court in the case of United States versus Tommie Ray Drummond that the defendant is fully competent and capable of entering an informed plea, that the defendant is fully competent and capable

20

of entering an informed plea, that the defendant is aware of the nature of the charges and the consequences of the plea, and that the plea of guilty is a knowing and voluntary plea supported by an independent basis in fact containing each of the essential elements of the offense. The plea is therefore accepted and the defendant is now adjudged guilty of th[ese] offense[s].

(*Id.* at 2-12)

4.      The Presentence Investigation Report was initially prepared by the Probation Office on May 2, 2007 (*see* Doc. 18, at 1) and distributed to the parties (*see* Docs. 12 & 14). While the parties disagreed with the report on a few particulars, in the main neither side objected to the report. (*See id.*) Based upon the statutory offense level of 27 and all other factors contained in the report, United States Probation Officer Marc Seibert recommended that Drummond receive concurrent 70-month terms of imprisonment and be ordered to pay restitution in the total amount of $1,249,180.35 to the victim banks. (*See* Doc. 18, Sentencing Recommendation, at 1-4) While the Government agreed with the sentencing recommendation contained in the report (*see* Doc. 13, at 8), the defendant argued that a 70-month prison term was much too harsh (Doc. 15, at 6 ("[T]he 70-month sentence recommended by the United States is too severe and greatly exceeds a reasonable sentence considering all of the relevant circumstances.")) and requested the Court to "exercise its discretion and sentence Drummond to the lowest possible

reasonable period of incarceration." (*Id.*)

5.    During the sentencing hearing on June 6, 2007, the Court entertained the arguments of the parties regarding an appropriate sentence based on the agreed offense level of 27 and a criminal history category of I. (*See* Doc. 29, Sentencing Transcript)

>    THE COURT:        . . . I will hear from you, Mr. Ivey, as to what is an appropriate disposition.
>
>    MR. IVEY:   Judge, we've filed in our papers a couple of examples of cases out of the Eleventh Circuit where there have been downward departures of approximately a third of the recommended guideline, and what we can ask for for Mr. Drummond is just mercy, Judge. This gentleman's wife is very sick. He has no prior criminal history, nothing, even a speeding ticket[,] in the last 15 years. No indication that the public needs any protection from his likelihood of committing a crime like this again. He does have substantial restitution to face and he will be working and trying to pay that restitution. So we just ask for mercy.
>
>    THE COURT:        . . . Mr. Drummond, do you have anything that you would like to say before I impose sentence in your case?
>
>    THE DEFENDANT:        Just how sorry I am, Your Honor, for what I've done. **I take responsibility for what I've done**. **I'm sorry for** the embarrassment that I've caused my family, my friends, and **for the money that was lost by the people involved**. I'm just very sorry. **And I ask for any mercy you can give me based on my history and my wife's illness**.
>
>    THE COURT:      . . . Mr. Frandsen, does the government have a position?

MR. FRANDSEN:   Your Honor . . . [w]e would request that you go by the recommendations in the presentence report and the sentencing factors delineated in 3553, as set out in my papers. In my papers I've distinguished the two cases that Mr. Ivey cited as perhaps the basis for downward departure, and I would object, I would say that those are not relevant. . . .

THE COURT:        . . . I have considered the sentencing guidelines in this case and I've considered the statutory purposes of sentencing. And I find that the guidelines provide for an appropriate sentence. I do think it's unfortunate that all of this comes to a culmination at this particular point in your life, simply because of your wife's situation. However, this was a very sophisticated scheme that you pulled off for a number of years. And because of the extensive nature of it and because of the complexity of it, it took a very intelligent person to pull this off. And you certainly knew better. And I think that because of that in particular and because of what the public expects and the deterrent effect that a guideline sentence has in this case to this type of conduct, which is extremely significant to victims which are banks of the size of the banks in this particular case, I do find that a guideline sentence is appropriate. I will sentence at the low end of the guidelines, however. So I'm now going to state the sentence that I intend to impose and after I've stated it I will allow counsel to make legal objection before imposition of the sentence.

Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that the defendant, Tommie Ray Drummond, is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of 70 months. This term consists of 70 months as to each of counts one and two, said terms to be served concurrently.

Upon release from imprisonment, the defendant shall be placed on supervised release for a term of five years on each of counts one and two, said terms to run concurrently.

Within 72 hours of release from custody of the Bureau of Prisons, the defendant shall report in person to the probation office in the district to which he is released.

While on supervised release the defendant shall not commit any federal, state, or local crimes, the defendant shall be prohibited from possessing a firearm or other dangerous device and shall not possess a controlled substance.

In addition, the defendant shall comply with the standard conditions of supervised release as recommended by the . . . United States Sentencing Commission . . . and on record with this Court.

It is ordered that the defendant make restitution to the following victims at the addresses listed in the presentence report: Merchants and Farmers Bank of Greene County, amount due is [$]193,844.77.

Zurich U.S., amount due $200,000.

First National Bank of Jasper, amount due $268,705.02.

BankTrust, doing business as Sweet Water State Bank, amount due $273,400.40.

West Alabama Bank and Trust, amount due $313,230.16.

Restitution is due immediately and payable in full and is to be paid through the Clerk, U.S. District Court.

Payment to the victims shall be on a pro rata basis. If full restitution is not immediately paid, any amount owing during a period of incarceration shall be subject to payment through the Bureau of Prisons, Inmate Financial Responsibility Program.

As a special condition of SRT, the probation office shall pursue collection of any balance remaining at the time of release

in installments to commence no later than 30 days after the date of release.

If restitution is to be paid in installments, the Court orders that the defendant make at least minimum monthly payments in the amount of $300.

The defendant is ordered to notify the Court of any material change in his ability to pay restitution and the probation office shall request the Court to amend any payment schedule if appropriate.

Interest shall not accrue on this debt.

The Court orders that the defendant comply with the following conditions of specialized release: First, the defendant is prohibited from making any new purchases – or major purchase, rather; incurring new credit charges; or opening additional lines of credit without the approval of the probation office until such time as the financial obligations imposed by this order have been satisfied in full.

And, second, the defendant shall provide the probation office access to any requested financial information.

The Court finds that the defendant does not have the ability to pay a fine and therefore a fine is not imposed.

.  .  .  I also find that your personal history and characteristics suggest that drug testing or substance abuse testing is not indicated and therefore such testing is waived.

I do find that . . . the advisory guideline range is appropriate to the facts and circumstances of this case and provides for a reasonable sentence, given the statutory purposes of sentencing and because the sentence imposed does address the seriousness of the offense and the sentencing objectives of punishment, deterrence, and incapacitation.

It is ordered that the defendant pay a special assessment in the amount of $100 on each of counts one and two, for a total of $200, which shall be due immediately.

Now, having stated the sentence I intend to impose, are there any objections to it?

MR. IVEY:   No, ma'am.

THE COURT:      I hereby impose the sentence as previously stated.

Now, Mr. Drummond, **you have the right to appeal your guilty plea if you think there is some fundamental defect in your conviction**. **You also have a statutory right to appeal the sentence itself in certain circumstances.** However, you entered into a plea agreement which waives certain of your rights to appeal the sentence itself. Such waivers are generally enforceable, but if you believe the waiver to be unenforceable you can present that theory to the appellate court. **If you decide to appeal, you must do so within 10 days of entry of judgment in this case, and Mr. Ivey could file that notice for you.**

Now, is there any objection to Mr. Drummond remaining on the same conditions of release pending designation of an institution.

MR. FRANDSEN:   No, Your Honor.

THE COURT:      . . . I will allow you to remain under those conditions of release pending designation.

(*Id*. at 2-8; *see also* Doc. 19 (judgment in a criminal case))

6.   Some eleven and one-half months later, on May 30, 2008,

Drummond filed the present collateral attack on his convictions and sentences

26

pursuant to 28 U.S.C. § 2255. (Doc. 21; *see also* Doc. 22 (brief in support of § 2255 petition)) Therein, petitioner raises the following grounds which he claims entitle him to relief: (1) ineffective assistance of counsel due to trial counsel's failure to discuss and file a notice of appeal; (2) his plea of guilty to the charges was not knowingly and voluntarily entered because trial counsel failed to correct aspects of the plea agreement with which petitioner did not agree and told him nothing could be done about the 70-month sentence he received though he had assured him he would only receive a sentence ranging from 6 to 18 months; (3) ineffective assistance of counsel due to trial counsel's advice to plead guilty without the benefit of any discovery or knowledge of the government's case against him;[2] and (4) trial counsel coerced him into pleading guilty by telling him that if he did not sign the plea agreement, the government would prosecute his sick wife and elderly mother. (*See* Doc. 21, at 5-6; Doc. 22, at 1-11)

7.     In its response in opposition to Drummond's § 2255 petition, the United States contends that petitioner's claims have no merit. (*See* Doc. 32) The United States attached to its response the affidavit of Drummond's trial

---

[2]     More specifically, it is petitioner's contention that trial counsel should have waited until he received exculpatory information under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), to advise Drummond that he should plead guilty to the charges.

counsel, Garve Ivey, Jr., same reading, in relevant part, as follows:

6.      I reviewed carefully with Mr. Drummond [his case,] including all the facts and circumstances of his conduct involving the movement of business checks among several financial institutions in Alabama. We discussed outcomes of pleading guilty prior to being charged by indictment and going to trial and challenging any charges the government might bring. We discussed possible sentences if found guilty of any criminal conduct involving the financial institutions. We discussed the health of his wife and mother.

7.      Mr. Drummond made the informed and conscious decision to plead guilty prior to charging by indictment and cooperate with the government in his case. **I negotiated the terms of the charging and plea documents with the attorneys for the government. I explained to Mr. Drummond that the terms of the plea agreement could not guarantee any particular sentence.**

8.      **I did not promise Mr. Drummond a sentence of 6 to 18 months incarceration if he pled guilty.**

9.      To cooperate with the government Mr. Drummond agreed to be interviewed at my law office by agents of the Federal Bureau of Investigation two separate times. I was present, at times along with an associate, during the two interviews and the interviews lasted many hours. He was shown copies of documents that the government acquired during the investigation.

10.      **Nearly a year after the interviews, the government provided draft copies of the Plea Agreement and Factual Resume to be executed if Mr. Drummond decided to plead guilty. I reviewed the documents carefully with Mr. Drummond at my office**. The documents estimated the dollar amount of loss suffered by four of the seven financial institutions involved to be about $1.2 million. The amount of

restitution was the same. We made some minor changes that the government agreed to. The government agreed that all counts should group for sentencing. The government did not agree to transfer the matter to another district closer to the residence of Mr. Drummond and my office as we requested.

11.     I did not tell Mr. Drummond that nothing could be changed or the deal would be off. In fact, I left the decision as to the guilty plea entirely up to Mr. Drummond, who I found to be an intelligent and reasonably sophisticated client.

12.     On February 5, 2007, in District Court . . . Mr. Drummond pled guilty to an information charging him with two counts of violating 18 U.S.C., Section 1344 (bank fraud). . . . **I did not then, nor do I now, see any possibility of anything exculpatory outside the files and documentation provided by the government.**

13.     Mr. Drummond was interviewed for the Presentence Investigation Report. The report recommended that Mr. Drummond receive a three point reduction in the offense level for acceptance of responsibility. Mr. Drummond made no objection to the sentencing factors and facts set out in the report and I filed a position paper accordingly. The report provided a Sentencing Guideline sentencing range of 70 to 87 months incarceration. I explained this to Mr. Drummond. Mr. Drummond never said to me that he did not want to plead guilty and he never said to me that he wanted to go to trial. To the contrary, Mr. Drummond at all times maintained his position that he did want to plead guilty and that he did not want to go to trial.

14.     I filed motions with the district court arguing for lesser sentence below the recommended sentence based on the facts and relevant law. The government opposed the motions and the court denied the motions.

.       .       .

16.     I did not tell Mr. Drummond that he had to accept the sentence or that the government would prosecute his sick wife and elderly mother if he did not accept. I never had any reason to believe that Mr. Drummond's wife or mother were targets of any investigation, and I did not say that or lead Mr. Drummond to believe it.

17.     **I did not prepare an appeal to the court of appeals after discussing the matter with Mr. Drummond. We agreed the plea agreement precluded appeals except in some circumstances described in the plea agreement**.

18.     I did discuss with Mr. Drummond prior to sentencing the facts of the grounds he raises in the motion.

.        .        .

20.     I contest each of Mr. Drummond's allegations to the extent he claims ineffective assistance of counsel by me or that I misled him. I express no opinion on the validity of his grounds to set aside a sentence.

21.     Ground one of Drummond's petition raises the issue of the failure to discuss and file the notice of appeal. **Mr. Drummond and I discussed the fact that the plea agreement included an agreement not to appeal except under limited circumstances and Mr. Drummond's position was that he had no intention of appealing in any event. Mr. Drummond never changed that instruction to me or indicated any objection to that term of wish to appeal**.

22.     Ground Two of Drummond's petition raises the issue of a refusal to make changes to the facts of the plea agreement. This is not true. In fact, the government agreed to some minor changes, those being the only ones Mr. Drummond disagreed with.

23.     Ground Three of Drummond's petition raises the

issue of a failure to investigate exculpatory evidence. By this [argument] [] Mr. Drummond is referring to his position and allegation that certain bankers were complicit in the acts complained of and that they should be prosecuted. On Mr. Drummond's behalf, I raised those issues to the agents investigating the case, and they met with Mr. Drummond and questioned him extensively about those allegations. Mr. Drummond gave details to the agents on these allegations, and I believe that Mr. Drummond presented the allegations in their best light for him. In that light, I did not hear him describe any activity that I thought was actionable or exculpatory to him, but kept those conclusions to myself and allowed the agents to make their own determinations.

24.     Ground Four of Drummond's petition raises the issues of allegedly having allowed the government to coerce Mr. Drummond into accepting a plea agreement. I absolutely, unequivocally deny that any such thing ever happened. Mr. Drummond was not coerced in any way, nor by anyone, at any time. No one from the investigative side ever treated Mr. Drummond with anything but respect, and had any coercion taken place in any form I would have immediately stopped the interview. . . . This allegation is patently untrue.

(Doc. 32, Affidavit of Garve Ivey, Jr., at ¶¶ 6-14, 16-18 & 20-24)

## CONCLUSIONS OF LAW

1.     28 U.S.C. § 2255 reads, in relevant part, as follows: "A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess

of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence."

2.      In this instance, Drummond contends that constitutionally ineffective assistance of trial counsel entitles him to the relief afforded by 28 U.S.C. § 2255.[3] In order to establish a claim of ineffective assistance of counsel, a petitioner is required to show (1) that his attorney's representation fell below "an objective standard of reasonableness" and (2) that a reasonable probability exists that but for counsel's unprofessional conduct, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The *Strickland v. Washington* standard for evaluating claims of ineffective assistance of counsel was held applicable to guilty pleas in *Hill v. Lockhart*, 474 U.S. 52, 58, 106 S.Ct. 366, 370, 88 L.Ed.2d 203 (1985).

---

[3]      Once a criminal defendant enters a guilty plea, he waives all non-jurisdictional challenges to the conviction's constitutionality and only an attack on the voluntary and knowing nature of the plea can be raised. *See McMann v. Richardson*, 397 U.S. 759, 772, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763 (1970). Stated differently, "a voluntary and intelligent plea made by an accused person, who has been advised by *competent counsel*, may not be collaterally attacked." *Mabry v. Johnson*, 467 U.S. 504, 508, 104 S.Ct. 2543, 2546-2547, 81 L.Ed.2d 437 (1984) (emphasis supplied). Therefore, when a § 2255 motion is filed collaterally challenging convictions obtained pursuant to guilty pleas, "the inquiry is ordinarily confined to whether the underlying plea was both counseled and voluntary." *United States v. Broce*, 488 U.S. 563, 569, 109 S.Ct. 757, 762, 102 L.Ed.2d 927 (1989).

> To succeed on such a claim, "the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).[4] In addition, the defendant must establish that "counsel's constitutionally ineffective performance affected the outcome of the plea process." *Hill*, 474 U.S. at 59, 106 S.Ct. at 370. In other words, . . . [a petitioner] "must show that there is a reasonable probability that, but for counsel's errors, he would . . . have pleaded [not] guilty and would . . . have insisted on going to trial." *Hill*, 474 U.S. at 59, 106 S.Ct. at 370.

*Coulter v. Herring*, 60 F.3d 1499, 1504 (11th Cir. 1995) (footnote, brackets and ellipses added), *cert. denied sub nom. Coulter v. Jones*, 516 U.S. 1122, 116 S.Ct. 934, 133 L.Ed.2d 860 (1996).[5]

3.     When applying the *Strickland* standard, it is clear that courts "are free to dispose of ineffectiveness claims on either of its two grounds." *Oats v. Singletary*, 141 F.3d 1018, 1023 (11th Cir. 1998) (citation omitted), *cert. denied sub nom. Oates v. Moore*, 527 U.S. 1008, 119 S.Ct. 2347, 144 L.Ed.2d 243 (1999); *see also Butcher v. United States*, 368 F.3d 1290, 1293 (11th Cir.

---

[4]     "When analyzing ineffective-assistance claims, reviewing courts must indulge a strong presumption that counsel's conduct fell within the wide range of reasonably professional assistance." *Smith v. Singletary*, 170 F.3d 1051, 1053 (11th Cir. 1999) (citations omitted).

[5]     It is proper in considering claims made by a federal prisoner under § 2255 to look for guidance from cases discussing claims raised by state prisoners under 28 U.S.C. § 2254. *See Hagins v. United States,* 267 F.3d 1202, 1205 (11th Cir. 2001) (citing *Holladay v. Haley*, 209 F.3d 1243 (11th Cir. 2000)), *cert. denied*, 537 U.S. 1022, 123 S.Ct. 545, 154 L.Ed.2d 432 (2002).

2004) ("[O]nce a court decides that one of the requisite showings has not been made it need not decide whether the other one has been.").

4.      Petitioner's first claim of ineffective assistance of counsel is that counsel erred in failing to discuss with him and file a notice of appeal once the "'deal' with the government that [he] would receive a sentence of between 6 to 18 months[]" did not come to fruition. (Doc. 21, at 5; *see also* Doc. 22, at 1-4) Drummond's allegation that trial counsel did not discuss his appellate rights is refuted by Garve Ivey's affidavit statement to the contrary that the right to appeal under limited circumstances was discussed and that petitioner specifically informed him that he did not wish to pursue an appeal. Moreover, the record clearly reflects that there never existed any deal between the government and petitioner's defense attorney providing that Drummond would receive a sentence of between 6 and 18 months. The Plea Agreement which petitioner read and signed specifically provided that no promises were being made with respect to the sentence that could be imposed by the court and during the guilty plea colloquy the court placed Drummond on notice that she could reject any sentencing recommendation and sentence him more severely than he may have anticipated, that the court could not determine his sentencing range until after completion of the pre-sentence investigation report by his

34

probation officer, and that the sentence imposed could be different from any estimate given to him by his attorney.[6] Once the pre-sentence investigation report was completed, trial counsel explained that the range of punishment reflected in the report was 70 to 87 months (Doc. 32, Ivey aff., at ¶ 13) and the record is clear that at all times the government held to the position that Drummond should be sentenced to concurrent 70-month terms of imprisonment. While it is clear that trial counsel requested downward departure (Doc. 15), there was never any agreement that petitioner would receive a six to eighteen-month sentence, as was even implicitly acknowledged by Drummond during his sentencing (Doc. 29, at 3 ("I ask for any mercy you can give me based on my history and my wife's illness.")). Because Drummond has not set forth in this ground a legitimate attack on his sentence that could have been raised on appeal,[7] the undersigned recommends that the

---

[6]      *See United States v. Gordon*, 4 F.3d 1567, 1570 (10th Cir. 1993) ("A miscalculation or erroneous sentence estimation by defense counsel is not a constitutionally deficient performance rising to the level of ineffective assistance of counsel."), *cert. denied*, 510 U.S. 1184, 114 S.Ct. 1236, 127 L.Ed.2d 579 (1994).

[7]      The trial court sufficiently explained to petitioner that he had reserved the right to appeal in the following limited circumstances: (1) if the punishment imposed was in excess of the statutory maximum; (2) if the punishment imposed constituted an upward departure from the guideline range; and (3) claims of ineffective assistance of counsel. Certainly, petitioner's claim that he now raises that there was an agreement that his punishment would range from six to eighteen months does not fall within any of the limited exceptions noted above. Therefore, trial counsel was not deficient in failing to consult further with petitioner about an appeal or file a notice of appeal since the sentence was not illegal and no rational defendant would want to

Court find that trial counsel was not deficient in failing to file notice of appeal.[8]

5.      Petitioner next contends that his plea of guilty to the two counts of the Information was not knowingly and voluntarily entered because trial counsel failed to correct aspects of the plea agreement with which petitioner did not agree and told him nothing could be done about the 70-month sentence he received though he had assured him he would receive a sentence ranging from 6 to 18 months.[9] The undersigned has previously addressed the latter portion of Drummond's claim in this regard. The undersigned simply reiterates that petitioner was cognizant of the fact that he could receive a sentence within

---

appeal; in addition, as indicated above, Drummond did not reasonably demonstrate to counsel that he was interested in appealing. *Cf. Devine v. United States*, 520 F.3d 1286 (11th Cir. 2008) (finding under the circumstances that counsel had no affirmative duty to consult further with the defendant about an appeal and was not deficient in failing to file a direct appeal).

[8]      If Drummond really desired to raise this issue on appeal he was well aware of the factual basis of same when his sentencing hearing was completed and, having been informed by the Court for the second time at that hearing of his limited right to appeal, he could have filed notice of appeal and pursued a direct appeal.

[9]      The record makes clear that Drummond is an intelligent individual and an experienced businessman. He read each document pertinent to this case, undoubtedly many times, and wisely concluded that it was in his best interests to plead guilty to both counts of the Information and be sentenced in accordance with the Sentencing Guidelines (after being credited for accepting responsibility) rather than risk a trial and possible sentence of 30 years' imprisonment with respect to each count of the Information. The documents in this case, as referenced above, establish that Drummond's guilty pleas were both voluntary and counseled. *See Broce, supra.*

the range of 70 to 87 months, that there was no agreement between the parties that his sentence would fall in the range of six to eighteen months, and that any talk of such a sentence was based upon the hope that the Court would have mercy on him and depart downward from the sentencing guidelines. With respect to the former portion of the argument, Ivey has stated that he went over the Plea Agreement and Factual Resume with petitioner and requested that small changes be made to same, which were made, based upon his conversations with Drummond. (Doc. 32, Ivey aff., at ¶¶ 10 & 22) Moreover, the primary "facts" petitioner points to which he claims he did not agree,[10] namely, a "scheme to defraud," cut to the very heart of the counts of the Information to which petitioner pled guilty.  In order to convict petitioner of bank fraud the government would necessarily have to establish a scheme to defraud; therefore, such scheme to defraud also necessarily would have to be part of any plea agreement. Accordingly, trial counsel was not deficient in failing to request such a change in the plea agreement.[11]

---

[10]     The other "facts" petitioner cites simply are not material.

[11]     Petitioner has not convinced the undersigned that but for counsel's errors he would have pled not guilty and insisted on going to trial. Drummond was facing 30 years' imprisonment with respect to each count of the Information had he proceeded to trial and been convicted. The concurrent 70-month terms of imprisonment petitioner received pale in comparison to the terms of imprisonment he could have received had he been convicted of bank fraud following a jury trial. Moreover, Drummond cooperated with investigators and certainly gave them the information with which to convict him of bank fraud. Therefore, he could not risk

6.     Petitioner next argues that trial counsel was ineffective in advising him to plead guilty prior to the receipt of any discovery from the government (that is, *Brady* material) or knowledge of the government's case against him. It is clear from Ivey's affidavit that when federal investigators interviewed Drummond information they had garnered was shared with petitioner and his attorney.[12] Moreover, it is clear that trial counsel is unaware to this date that any *Brady* material exists nor has petitioner provided this Court any factual basis upon which it can base a conclusion that such material exists. Finally, petitioner has failed to cite this Court to any case which establishes that it is deficient for an attorney to advise a client to plead guilty prior to receiving exculpatory evidence, if available, and complete knowledge of the government's case. *Cf. United States v. Ruiz,* 536 U.S. 622, 630 & 633, 122 S.Ct. 2450, 2456 & 2457, 153 L.Ed.2d 586 (2002) ("[T]his Court has found that the Constitution, in respect to a defendant's awareness of relevant circumstances, does not require complete knowledge of the relevant circumstances, but permits a court to accept a guilty plea, with its

---

going to trial for fear that his term or terms of imprisonment would have been longer than those he was subject to based upon his acceptance of responsibility.

[12]     In addition, as reflected in the Plea Agreement, Ivey explained to Drummond his understanding of the United States' evidence. (Doc. 2, at ¶ 6)

accompanying waiver of various constitutional rights, despite various forms of misapprehension under which a defendant might labor. . . . [T]he Constitution does not require the Government to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant."). Therefore, the undersigned declines to find counsel deficient in counseling a guilty plea in a case which the Plea Agreement and Factual Resume establish as open-and-shut particularly when the acceptance of responsibility helped reduce the range of punishment.

7.     Finally, petitioner contends that trial counsel coerced him into pleading guilty by telling him that if he did not sign the plea agreement the government would prosecute his sick wife and elderly mother. Notwithstanding the fact that Drummond specifically stated in open court that he had not been forced to plead guilty, *see United States v. Medlock*, 12 F.3d 185, 187 (11th Cir. 1994) ("There is a strong presumption that the statements made during the colloquy are true."), even if his attorney made such a comment to him petitioner has simply not established that had the comment not been made he would have pled not guilty and would have insisted on going to trial. As indicated above, by pleading guilty petitioner assured himself of concurrent sentences at the low end of the sentencing guideline range rather

than facing the possibility of consecutive sentences of up to 30 years each with respect to each charge. The only viable and intelligent option for Drummond, an intelligent man, was to plead guilty to the two counts of bank fraud set forth in the Information.

8.     In consideration of the foregoing, the Magistrate Judge recommends that the Court deny Drummond's motion to vacate, set aside or correct his sentence under 28 U.S.C. § 2255.

## CONCLUSION

The Magistrate Judge is of the opinion that petitioner's rights were not violated in this cause and that his request to vacate, set aside or correct his sentence should be **DENIED**.

The instructions which follow the undersigned's signature contain important information regarding objections to the report and recommendation

of the Magistrate Judge.

**DONE** this the 25th day of August, 2008.

  s/WILLIAM E. CASSADY

**UNITED STATES MAGISTRATE JUDGE**

**MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS AND
RESPONSIBILITIES FOLLOWING RECOMMENDATION, AND
FINDINGS CONCERNING NEED FOR TRANSCRIPT**

l.      *Objection*.  Any party who objects to this recommendation or anything in it must, within ten days of the date of service of this document, file specific written objections with the Clerk of this court.  Failure to  do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the Magistrate Judge.  *See* 28 U.S.C. § 636(b)(1)(C); *Lewis v. Smith*, 855 F.2d 736, 738 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. Unit B, 1982)(*en banc*).  The procedure for challenging the findings and recommendations of the Magistrate Judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a 'Statement of Objection to Magistrate Judge's Recommendation' within ten days after being served with a copy of the recommendation, unless a different time is established by order.  The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.  The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.  It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.  Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.      *Transcript (applicable Where Proceedings Tape Recorded)*.  Pursuant to 28 U.S.C. § 1915 and FED.R.CIV.P. 72(b), the Magistrate Judge finds that the tapes and original records in this case are adequate for purposes of review.  Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

s/WILLIAM E. CASSADY
**UNITED STATES MAGISTRATE JUDGE**